# 26 MAG 1865

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JONATHAN ERIC GARDINER,<br>    a/k/a "Player,"<br><br>                    Defendant. | **COMPLAINT**<br><br>Violation of 21 U.S.C. § 963 |

SOUTHERN DISTRICT OF NEW YORK, ss.:

MICHAEL COLEMAN, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

## COUNT ONE
### (Cocaine Importation Conspiracy)

1.      From at least in or about 2023, through on or about the date of the filing of this Complaint, in The Bahamas and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

2.      It was a part and an object of the conspiracy that JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, and others known and unknown, would and did knowingly and intentionally import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3.      It was further a part and an object of the conspiracy that JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, and others known and unknown, would and did manufacture and distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4.      The controlled substance that JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, conspired to (a) import into the United States and into the customs territory of the United States from a place outside thereof, and (b) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the

United States and into waters within a distance of 12 miles of the coast of the United States, was 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and Title 18, United States Code, Section 3238.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.      I have been a DEA Special Agent since 2017.  I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities, including international narcotics and weapons trafficking.  During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics traffickers operate, and I have participated in numerous investigations involving international drug trafficking.  This affidavit is based upon my participation in the investigation of this matter, including my conversations with law enforcement agents and other individuals, my review of photographs and recorded communications, and my review of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## **Background**

6.      Based on my participation in this investigation, including my conversations with law enforcement agents, confidential sources, and other individuals; my review of DEA reports; and my review of recordings, draft transcripts, and summaries of undercover communications, I have learned the following, in substance and in part[1]:

       a.      Since at least in or about 2022, the DEA has been investigating multiple drug trafficking organizations ("DTOs") transporting ton-quantity cocaine shipments by air and sea from Colombia, Venezuela, Haiti, and the Dominican Republic through The Bahamas and, ultimately, into the United States.

       b.      The Bahamas is an archipelago nation of approximately 700 islands, as well as numerous cays and islets, extending hundreds of miles from the coast of Florida.  Many of these islands are small, uninhabited, or sparsely populated.  The northernmost Bahamian islands are less than 100 nautical miles from the Florida coast.  For example, Bimini Island is approximately 45 nautical miles from Miami, Florida, and Grand Bahama Island is approximately 70 nautical miles from West Palm Beach, Florida.  In 2019, the U.S. Department of State noted that The Bahamas' "vast, disjointed territory, positioned between the southeast coast of Florida and the South

---

[1] Quoted and summarized portions of recorded communications referenced herein are based on my review of those communications, my conversations with confidential sources and other law enforcement officers about those communications, and draft transcriptions and translations of those communications that are subject to change.

America-Hispaniola trafficking vector, makes its waters appealing to transnational criminals smuggling illicit goods."[2]

        c.      Although The Bahamas has international airports on its northern and most densely populated islands, such as New Providence (where the capital of The Bahamas, Nassau, is located) and Grand Bahama, the country contains multiple, smaller airstrips throughout the southern portions of the island chain that generally do not require flight plans for arriving and departing aircraft.

        d.      Multiple DTOs have increasingly relied on these remote airstrips to transit drug loads through clandestine flights under the protection of local officials, including high-ranking members of the Royal Bahamian Police Force ("RBPF"). Once the drug loads arrive in The Bahamas, the DTOs work with members of the RBPF and other officials to move their illicit shipments up the island chain to the northernmost islands, where the shipments are transported into the United States by boat.

        e.      JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, is an international narcotics trafficker based in The Bahamas who sources ton-quantities of cocaine from Colombia and elsewhere through The Bahamas, for ultimate distribution in the United States.

### GARDINER Supplies Cocaine to a Georgia-Based DTO, Including an Approximately 9-Kilogram Shipment of Cocaine in or about February 2023

        7.      On or about June 4, 2024, a grand jury in the Northern District of Georgia returned an indictment (the "Georgia Indictment") charging approximately 14 individuals with federal narcotics offenses, arising out of their participation in a Georgia-based DTO (the "Georgia DTO") involved in the importation and distribution of cocaine. The charged individuals included the leader of the Georgia DTO ("CC-1"); a drug supplier for the Georgia DTO, who went by the alias "Shorty" ("CC-2")[3]; a drug distributor for the Georgia DTO ("CC-3"); a drug and currency transporter for the Georgia DTO ("CC-4"); and a drug stash house operator for the Georgia DTO ("CC-5").

        8.      As described further below, JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, was a foreign supplier of cocaine for the Georgia DTO. Among other things, in or about February 2023, GARDINER supplied a multi-kilogram shipment of cocaine to the Georgia DTO (the "February 2023 Shipment"), which was sent by GARDINER from The Bahamas to

---

[2] U.S. Department of State, Bahamas, Bureau of International Narcotics and Law Enforcement Affairs, https://www.state.gov/the-bahamas/.

[3] Notably, JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, and CC-2 were both incarcerated at a particular federal prison during an overlapping time period, from in or about February 2007 to in or about February 2008, following GARDINER's August 31, 2006 conviction in the Southern District of Florida for federal narcotics and money laundering offenses. GARDINER was sentenced to 220 months' imprisonment for those offenses, and in or about 2014, was deported to The Bahamas.

Miami, Florida, where it was then received by CC-2 and subsequently transported by CC-4 to CC-1, who was located at the time in Georgia.

9.      Based on my review of wiretap intercepts of calls to and from two telephone numbers used by CC-1[4]; an extraction of a cellphone used by CC-3[5]; the contents of an Apple iCloud account belonging to JONATHAN ERIC GARDINER, a/k/a "Player," the defendant[6]; toll records; and travel records, I have learned the following:

> a.      In or about December 2022, CC-2 and CC-3 traveled with one another to Nassau, The Bahamas;

> b.      The following month, in or about January 2023, CC-1 sent CC-4 to Florida to meet with CC-2;

> c.      A few weeks later, in or about February 2023, CC-1 again send CC-3 to Florida, this time to retrieve a shipment of cocaine from CC-2, which CC-2 was sourcing from GARDINER;

> d.      When CC-4 arrived in Florida, there were initially delays in completing the transaction, as CC-2 had not yet received the narcotics from GARDINER;

> e.      Eventually, however, CC-2 received the narcotics from GARDINER, and CC-2 then provided the narcotics to CC-4, who subsequently transported the narcotics from Florida to CC-1 in Georgia;

> f.      After CC-4 retrieved the narcotics from CC-2, which consisted of approximately 9 kilograms of cocaine, CC-1 complained to CC-2 that the discussed amount was double what CC-2 had provided;

---

[4] On or about February 17, 2023, Title III wiretaps were authorized on, among other things, telephone numbers ending in 2448 and 4638 (the "2448 and 4638 Numbers"). Those wiretaps were re-authorized on or about April 6, 2023 and on or about June 16, 2023. Based on a review of the content of the calls intercepted pursuant to those wiretaps, and a comparison of the voice of the user of the 2448 and 4638 Numbers to the voice of CC-1, DEA agents confirmed that the 2448 and 4638 Numbers belonged to and were used by CC-1.

[5] DEA agents seized this cellphone during a search of CC-3's residence on or about July 11, 2014, which was conducted pursuant to a search warrant.

[6] DEA agents seized and searched the contents of the iCloud account in question pursuant to a search warrant dated October 31, 2023. Based on their review of the contents of the iCloud account, DEA agents confirmed that the account belonged to and was used by GARDINER—for example, in messages contained within the iCloud account, the user of the account self-identified as "Gardiner," "Jonathan," and "Jonathan from the Bahamas"—and that it was associated with a telephone number ending in 6984 (the "6984 Number"). References in paragraphs seven through 11 herein to communications with GARDINER refer to communications with the 6984 Number.

g.      Following the February 2023 Shipment, in or about June 2023, CC-1 discussed with a DEA confidential source procuring a larger amount of narcotics, approximately 200 kilograms or more of cocaine, from GARDINER;

h.      And finally, in or about July 2023, CC-2 and CC-3 discussed needing to find a new source of drug supply other than GARDINER, after seeing news reports of Coast Guard seizures of cocaine in the Carribean.

10.      More particularly, based on my review of the sources of information set forth above in paragraph nine, I have learned the following concerning the specific timeline of activities leading up to, and following, the February 2023 Shipment:

a.      In or about December 2022, CC-2 and CC-3 traveled together to Nassau, The Bahamas.  CC-3 returned to the United States on or about December 21, 2022, while CC-2 remained in The Bahamas until on or about January 18, 2023.  Following CC-2's and CC-3's trip to The Bahamas, CC-1, CC-2, CC-3, CC-4, and GARDINER began to coordinate the February 2023 Shipment.

b.      For example, on or about January 24, 2023 (a Tuesday), CC-3 texted CC-1, "Hit me when you can Bro," "Shorty [*i.e.*, CC-2] says he'll be in place by Saturday [*i.e.*, January 28, 2023]."  Two days later, on or about January 26, 2023, CC-2 texted GARDINER, "Shorty here."  CC-4 then traveled to Melbourne, Florida on or about January 27, 2023 and stayed until January 28, 2023.

c.      Between on or about January 27 and 28, 2023, CC-2 exchanged approximately 15 communications (including both calls and text messages) with CC-1, approximately 12 communications (same) with CC-3, and approximately 26 communications (same) with CC-4.

d.      On or about February 6, 2023, CC-3 texted CC-1, "The Lender was inquiring about close out. Shorty wants to take the majority down south today to take care of the guys who brought us across. I am about halfway down myself and I have some drinks for you as well . . . ."

e.      On or about February 7, 2023, CC-2 texted CC-3, "What you think time frame for little bro visit" and "What[']s happening doctor u up yet Need to get down there."  Approximately 10 minutes later, CC-2 texted GARDINER, "Hey doctor Bill son had seizure and in hospital. Collection just waiting on lil man" and "Planned for last nite. Call you soon."

f.      On or about February 10, 2023, CC-3 called CC-2 at approximately 12:40 a.m.  At approximately 2:03 a.m., CC-3 texted CC-2, "Stay up, I'll be pulling off in a second"; and at approximately 3:24 a.m., GARDINER texted CC-2, "Yo."  A few hours later, at approximately 6:28 a.m., CC-3 texted CC-2, "Fumbling thru this mail.  Does Bro have his sorter machine there?"[7]  CC-2 responded, "Yes."  Approximately 14 minutes later, at approximately

---

[7] Based on my training, experience, and involvement in this investigation, I believe "sorter machine" is a reference to a money counting machine, which is commonly used by drug traffickers. During searches of CC-1's and CC-3's residences conducted pursuant to search warrants on or

6:42 a.m., CC-2 texted GARDINER, "Hey doctor Got go positive news bro You're going to love this situation."

g.    On or about February 19, 2023, during a call between CC-1 and CC-4, CC-4 asked CC-1 if "Tuesday" [*i.e.*, February 21, 2023] was still "100%" for Florida, because CC-4 purportedly wanted to book his ticket.  CC-1 responded that he was almost "positive," but that he would make a phone call and report back to CC-4.  Approximately four hours later, CC-1 spoke with CC-2 and informed CC-2 that CC-4 would leave for Florida on or about February 21, 2023.  CC-2 responded that he had spoken with "lil bro," who had said that he had "6."  CC-1 and CC-2 continued to speak in a cryptic manner while discussing various numerical figures, including a reference to CC-1 being short "30."  CC-2 stated that he would make sure "they" understand the situation and that CC-2 understood that CC-1 had "30 years of investment in the next few days."  CC-1 said that he wanted to acquire close to "70," and CC-2 stated that he did not want to call the third party without good information.  CC-2 further stated that "he" [*i.e.*, GARDINER] had called CC-2 late the previous night, but that CC-2 had missed the call and messaged "him" that they were waiting on the Uber.[8]  CC-1 responded to CC-2 that this was not a lie, because the "Uber ride's" birthday was on Monday (that is, February 20).  Based on my review of Georgia Department of Motor Vehicle records, I have learned that CC-4's birthday is on or about February 20, 1987.

h.    On or about February 20, 2023, at approximately 10:49 p.m., during a call between CC-1 and CC-3, CC-1 and CC-3 discussed the collection of drug proceeds for the pending drug transaction.  CC-1 insisted that he wanted his courier to travel the following morning.  CC-3 advised that he was waiting on other associates and was in the process of obtaining payments.  Approximately five minutes later, CC-1 called CC-2 and informed CC-2 that CC-4 would arrive at CC-1's residence in the morning, and that CC-3 was going to have individuals arriving at the residence with "6-0," which, based on my training and experience, I believe to be a reference to $60,000 in drug proceeds.  CC-2 said that was "music to [his] ear."  CC-1 further explained that the purpose of the call was to inform CC-2 of the "game plan," and CC-1 mentioned "6-8" and "7-1," which, based on my training and experience, I believe indicated that CC-1 was hoping to collect $68,000 or $71,000.

i.    On or about February 21, 2023, at approximately 10:23 a.m., CC-1 called CC-4 and informed CC-4 that CC-1 was putting funds together prior to CC-4's traveling from Georgia to Florida to meet with CC-2.

j.    As CC-1 was coordinating the transfer of funds to CC-4, which CC-4 was then to transport to CC-2 in Florida, CC-2 continued to update GARDINER on the status of the operation.  For example, on or about February 21, 2023, at approximately 5:58 p.m., CC-2 texted GARDINER, "Doctor gonna be late Linking with bless for 4 particulars" and "all is well."

---

about July 2023 and June 2024, respectively, law enforcement officers recovered approximately three money counting machines.

[8] Data from GARDINER's iCloud account confirms that CC-2 indeed missed a call from GARDINER at approximately 2:12 a.m. on or about February 18, 2023.  Approximately two minutes later, CC-2 texted GARDINER, "Doctor missed your call."  The next day, CC-2 texted GARDINER, "Waiting for the Uber."

Approximately three hours later, CC-2 texted GARDINER, "Talked to nephew got understanding."

k.      Later that evening, at approximately 9:31 p.m., CC-4 informed CC-1 on a phone call that CC-4 was approximately 2.5 hours away, which I understand to mean that CC-4 was approximately 2.5 hours away from where CC-4 was supposed to meet with CC-2.  CC-1 responded that he would notify CC-2.

l.      The next morning, at approximately 8:13 a.m. on or about February 22, 2023, CC-4 told CC-1 on a phone call that CC-4 had attempted to call CC-1 the night before, because "he," *i.e.*, CC-2, was not ready and did not have it, which I believe is a reference to the drug load, and that CC-2 needed to meet a third party—which I believe is a reference to CC-2's supplier, GARDINER.  CC-4 explained that he and CC-2 had met in person the night before, but that the transaction was at a standstill.  Approximately three hours later, CC-1 spoke with CC-4 by phone again and stated, among other things, that the third party needed more time.

m.      Later that day, at approximately 4:25 p.m., CC-4 again spoke by phone with CC-1.  CC-4 stated that he had spoken with "him"—which I believe to be a reference to CC-2— and that "he" had agreed to meet at CC-4's hotel that evening.  Toll records confirm that a few minutes earlier, at approximately 4:18 p.m., CC-4 had made an outgoing call to CC-2.

n.      At approximately 8:38 p.m. that night, on or about February 22, 2023, CC-2 called CC-1, and CC-1 asked CC-2 if the deal would occur by 12:00 p.m. the next day.  CC-2 responded that he had just spoken with the "guy"—which, again, I believe to be a reference to GARDINER—and he believed that the deal would take place by then.  CC-2 explained that the "babysitter" was far out and had other agendas, and that it was a timing issue.  Approximately one hour later, at approximately 9:37 p.m., CC-1 called CC-4 and informed CC-4 that they were having issues with the "babysitter" living far from where CC-4 was located, and that the soonest that someone could meet CC-4 would be 12:00 p.m. the following day.  Given the delays, CC-1 stated that he would increase CC-4's courier fee to $5,000.

o.      Following these exchanges, which reflect that CC-2 was evidently facing delays in receiving from his supplier (*i.e.*, GARDINER) the cocaine for CC-4 and CC-1, CC-2 again checked in with GARDINER.  At approximately 10:12 p.m., CC-2 texted GARDINER, "Do I need to buy more time?"  And at approximately 10:26 p.m., CC-2 texted GARDINER, "Go to the site you showed me Let me know when you're on," which I interpret to have been an invitation to GARDINER to transfer their communications to another, more secure, platform.

p.      The next morning, at approximately 9:35 a.m. on or about February 23, 2023, CC-1, CC-2, and CC-4 participated in a three-way conference call, during which CC-2 directed CC-4 to meet CC-2 at a previously discussed location.  Less than two hours later, at approximately 11:15 a.m., CC-1 called CC-4, and CC-4 confirmed that the transaction had occurred and that CC-4 was en route back to Georgia.  CC-4 further described the package as small, and said that he believed he had picked up five to seven units.  CC-4 said that he was surprised by the number of units, considering the amount of cash that CC-1 had previously had CC-4 deliver to CC-2.  CC-1 responded that the count was supposed to be "double" what CC-4 had received.

q.       At approximately 1:28 p.m. that day, CC-2 called CC-1 and confirmed that the deal was complete and that CC-4 had left.  CC-1 suggested that the package was "light", but that CC-4 would return to Florida.  CC-2 acknowledged this, and he told CC-1 that he would travel to Georgia to see CC-1.  At approximately 8:15 p.m., CC-4 informed CC-1 that CC-4 was approximately 50 minutes away from CC-1's location, and approximately one hour later, CC-2 texted GARDINER, "Thanks doctor."

r.       At approximately 9:46 p.m. that day, after CC-4 had (presumably) arrived at CC-1's location and delivered the package, CC-1 called CC-4 and said that the package was not too bad or shabby, and that the package was a "niner."  Based on my training and experience, I understand this to mean that the package delivered by CC-4 contained approximately nine kilograms of cocaine.  Less than one hour later, at approximately 10:27 p.m., CC-1 called CC-2 to ask whether CC-1's friend, *i.e.*, CC-4, had left with "9 o-clock," and CC-2 confirmed that he had.  CC-1 then stated that when CC-2's supplier was ready, CC-1 would send CC-4 back to Florida.  CC-2 then confirmed that he would be in Atlanta, Georgia the next day, on or about February 24, 2023, to meet with CC-1.

s.       The next day, on or about February 24, 2023, CC-1 called CC-5 and said that the "tall dude," *i.e.*, CC-4, would be returning to CC-5's residence to pick up "2 dinner plates" that "looked pretty nice."  Based on my training and experience, I believe this to be a reference to two kilograms of cocaine.  CC-5 responded that CC-5 would place the items in a shoe box and provide it to CC-4.  That same day, CC-2 sent two text messages to GARDINER that CC-2 subsequently deleted, and CC-2 had two missed calls from GARDINER.

11.     Following the February 2023 Shipment, CC-1 continued to attempt to procure cocaine from JONATHAN ERIC GARDINER, a/k/a "Player," the defendant.  In particular, in or about June 2023, CC-1 engaged in discussions with a DEA confidential source ("CS-1"[9]) about procuring approximately 200 kilograms or more of cocaine from The Bahamas.  For example:

a.       On or about June 12, 2023, during a recorded telephone conversation between CC-1 and CS-1, CC-1 stated that he had received two shipments of "10" and "20" from his source of supply.  Based on my training and experience, I believe that "10" and "20" refer to 10-kilogam and 20-kilogram quantities of cocaine.  As set forth above, the February 23, 2023 shipment contained approximately 9 kilograms of cocaine, and CC-1 had discussed sending CC-4 back to Florida to pick up another shipment that was "double" that amount.

---

[9] In or about May 2023, CS-1 was arrested for possession of narcotics and approximately $84,000.  CS-1 began providing information to the DEA in hopes of avoiding continued criminal charges, and the charges against CS-1 were subsequently dismissed.  CS-1 was previously convicted of multiple narcotics, fraud, robbery, firearms, and immigration offenses.  More recently, in or about July 2025, CS-1 was arrested in Florida for conspiracy to commit robbery and possession of a firearm. Those charges remain pending. CS-1 was deactivated as a confidential source for the DEA in or about June 2025, after being arrested on charges of making false statements on a passport application, before then being reactivated as a confidential source by another DEA division in or about October 2025.  Information provided by CS-1 has been found to be reliable and has been corroborated by other evidence obtained by law enforcement.

b.      CC-1 conferenced CC-2 into the June 12, 2023 recorded conversation with CS-1, and CC-1 and CC-2 proceeded to discuss the status of CC-1's planned larger shipment of cocaine in detail.  CC-1 also offered to introduce CS-1 to CC-2 in Florida, so that CS-1 could receive approximately 200 more kilograms of cocaine from CC-2, in addition to the approximately 200 kilograms of cocaine CC-1 was planning to receive from CC-2, as described above.  CC-1 and CS-1 then disconnected CC-2 from their call, and CC-1 proceeded to explain to CS-1 that CC-1's source of cocaine in The Bahamas (*i.e.*, GARDINER) had previously been incarcerated in federal prison in the United States,[10] was not allowed to enter the United States, had five private planes,[11] and flew from the "islands" to Florida.  CC-1 further explained that his source (*i.e.*, GARDINER) had the ability to coordinate loads of cocaine of 1,000 kilograms or more, that prior shipments from the source had "Bahamian symbols" on them, and that prior shipments had contained high-quality narcotics.

c.      On or about June 24, 2023, during a call between CC-1 and another co-conspirator, CC-1 explained that his source of supply in The Bahamas had four personal planes, was not allowed to enter the United States, was worth approximately $30 million, and had the ability to drop off 200 "vehicles" at a time.  CC-1 stated that the day prior, on or about June 23, 2023, CC-1 had connected with his source of narcotics via FaceTime, and during that videocall, the source showed CC-1 an airplane hangar containing at least 1,500 kilograms of cocaine.  CC-1 further described the logistics involved in shipping narcotics from The Bahamas to Miami, which included dealing with air traffic control and the coast guard, and CC-1 discussed the involvement of corrupt government officials in the operation.

d.      On or about July 12, 2023, CC-3 sent CC-2 a text message containing a link to a news article titled, "Coast Guard offloads cocaine worth $186M in Miami seized in Caribbean, Atlantic."  Less than approximately one hour later, CC-2 responded, "We need some body else We need to talk."  Based on my training and experience, I believe that in his response, CC-2 was suggesting to CC-3 that they needed to find a source of cocaine other than GARDINER, because, based on the article sent by CC-3, CC-2 believed that the risk of law enforcement interdiction of shipments from GARDINER was becoming too great.

### Witness and Co-Conspirator Statements about GARDINER

12.     On or about November 26, 2024, Indictment 24 Cr. 655 (GHW) was unsealed in the Southern District of New York, charging 13 individuals (the "Charged Defendants") with federal narcotics and firearms offenses, arising out of their participation in trafficking narcotics through The Bahamas and into the United States with the support and protection of corrupt

---

[10] As noted *supra* n.3, GARDINER was incarcerated in federal prison in the United States.

[11] From my review of law enforcement reports, I am aware that as of at least in or about March 2022, GARDINER owned at least one private aircraft, which was then registered under a U.S. tail number.

Bahamian government officials, including politicians and high-ranking members of the RBPF and Royal Bahamas Defence Force ("RBDF").[12]

13.    Based on my participation in this investigation, including my conversations with other law enforcement agents and other individuals, my review of law enforcement reports, and my review of photographs, videos, and electronic and recorded communications, I have learned the following, in substance and in part:

a.    Starting at least in or about 2023, the Charged Defendants and other members of the DTO engaged in electronic, telephonic, and in-person communications with confidential sources, including "CS-2" and "CS-3,"[13] who, working at the direction of the DEA, had been posing as associates of an international drug trafficking ring that imports ton-quantities of cocaine into the United States for sale and redistribution.

b.    For example, starting in or about August 2023, RBPF officers connected CS-2 with Curtis, who was then a Chief Superintendent of the RBPF responsible for supervising airport locations through The Bahamas. During CS-2's initial conversations with Curtis, Curtis offered to, among other things, help CS-2 and his associates traffic cocaine through The Bahamas. During subsequent meetings, many of which were audio and/or video recorded, Curtis and other DTO members discussed the planned cocaine trafficking, and Curtis and Symonette offered to supply CS-2's purported drug trafficking ring with armed protection and firearms for their drug loads that transited through The Bahamas.

c.    From my conversations with CS-2, I have learned, among other things, that GARDINER also uses a particular phone number ending in 2595 (the "2595 Number"); that GARDINER typically carries and uses multiple phones; that drug pilots Ferguson and DJ Ferguson have worked for GARDINER in the past; that GARDINER was involved with a drug load in or about 2023 in Rum Cay, Bahamas, during which the plane being used to transport cocaine crashed and the drug pilot died; and that GARDINER owns a business that GARDINER uses to, among other things, bid on Bahamian government-issued construction contracts and launder his narcotics trafficking proceeds.

d.    Between at least in or about July 2024 and November 2024, members of the DTO engaged in discussions with CS-3 and others about the importation of approximately 900 to 1,000 kilograms of cocaine through The Bahamas and onward to the United States for sale there,

---

[12] As relevant here, the Charged Defendants include RBPF Chief Superintendent Elvis Nathaniel Curtis ("Curtis"), RBPF Sergeant Prince Albert Symonette ("Symonette"), RBDF Petty Officer Darrin Alexander Roker ("Roker"), Colombian narcotics trafficker Luis Fernando Orozco-Toro ("Orozco-Toro"), Bahamian maritime drug trafficker Davon Revion Khaim Rolle ("Rolle"), and Bahamian drug pilots Darren Arthur Ferguson, a/k/a "Hubba" ("Ferguson") and Donald Frederick Ferguson II, a/k/a "DJ," a/k/a "Billy" ("DJ Ferguson").

[13] CS-2 has provided information to the DEA in exchange for financial compensation since approximately 2023. CS-2 has no criminal history. CS-3 has provided information to the DEA in exchange for financial compensation since approximately 2022. CS-3 has a prior history of narcotics trafficking. Information from CS-2 and CS-3 has been deemed reliable and corroborated by other evidence, including the recorded communications described herein.

before repatriating the proceeds back to The Bahamas.  During those conversations, many of which were audio and/or video recorded, Colombia-based drug trafficker Orozco-Toro (one of the Charged Defendants) confirmed, among other things, that the DTO could provide CS-3 with ton-quantity shipments of cocaine; and that the DTO had the support and protection of Bahamian government officials and high-ranking politicians, including a particular politician ("Politician-1"), who could provide security for the planned cocaine shipment.  During one particular video-recorded meeting on or about September 3, 2024, Orozco-Toro and CS-3 were discussing details of shipping "a large amount" from Colombia through The Bahamas and the roles and responsibilities of different members of the DTO.  Orozco-Toro said, among other things, that he was in direct communication with "Eric" (*i.e.*, GARDINER), Rolle, and other members of the DTO; referred to GARDINER by his nickname, "Player;" said that GARDINER was currently building government buildings;[14] and claimed that GARDINER was reportedly trying to keep his involvement below the radar of law enforcement.

e.    In connection with the planned 900 to 1,000-kilogram deal, during in-person meetings in The Bahamas on or about early October 2 and 3, 2024, drug pilot Ferguson drove CS-3 and Rolle to the Bahamian Parliament building in downtown Nassau, The Bahamas, where they met with Politician-1; Rolle introduced CS-3 to Politician-1 as his future associate, and explained to Politician-1, in sum and substance, that CS-3 would need to have his "work" guaranteed if CS-3 were to work with the DTO.  During a meeting on or about November 6, 2024 among CS-3, RBDF Petty Officer Roker, Rolle, DJ Ferguson, and others regarding that planned cocaine shipment, Roker accepted a payment of approximately $20,000 to assist CS-3 and CS-3's purported drug associates with the cocaine shipment.

### May 2026 Plane Crash and Recovery of Evidence from GARDINER

14.    Based on my participation in this investigation, including my conversations with other law enforcement agents and other individuals, publicly available news reports, law enforcement reports, and my review of photographs, videos, and electronic and recorded communications, I have learned the following, in substance and in part:

a.    On or about May 12, 2026, at approximately 12:05 p.m., a Beechcraft 300 King Air turboprop plane carrying 11 individuals—including JONATHAN ERIC GARDINER, a/k/a "Player," the defendant—crashed into waters off the coast of Florida.  The U.S. Coast Guard rescued all 11 passengers.

b.    When GARDINER was rescued, he was in possession of three phones, including a phone with the 2595 Number, *see supra* ¶ 13(c), and he was wearing the cross-body bag shown below on his person.  The cross-body bag held, among other things, a brown paper bag containing approximately $30,000 in bulk Bahamian currency—which corresponds to approximately the same amount in U.S. dollars—that was labeled with the handwritten name of Politician-1 (*i.e.*, the Bahamian politician certain of the Charged Defendants introduced CS-3 to in or about November 2024, in connection with the planned shipment of approximately 900 to

---

[14] Based on my participation in this investigation, I understand that comment to be a reference to GARDINER's company, which has bid on and secured Bahamian government-issued construction projects.

1,000 kilograms of cocaine, *see supra* ¶ 13(d)-(e)), as shown in the redacted photograph below:




      c.      Based on my training and experience and my participation in this and other narcotics investigations, the bulk cash recovered from GARDINER's bag is packed in a manner consistent with narcotics proceeds; moreover, I am aware that the Charged Defendants and other members of the DTO have claimed access to, and protection and support from, Bahamian politicians and government officials, and that certain of the Charged Defendants (including RBDF Petty Officer Roker) accepted payments in or about 2024 in connection with planned drug shipments.

      WHEREFORE, I respectfully request that a warrant be issued for the arrest of JONATHAN ERIC GARDINER, a/k/a "Player," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s authorized electronic signature
_____
MICHAEL COLEMAN
Special Agent
Drug Enforcement Administration

Pursuant to Federal Rule of
Criminal Procedure 41(d)(3) and 4.1

Sworn to me through the transmission of
this Complaint by reliable electronic means
(telephone), this 14th day of May, 2026.

_____
THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

12